J-S16044-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.H.M., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.L.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 181 MDA 2022 |

Appeal from the Decree Entered December 30, 2021
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-9141

BEFORE: PANELLA, P.J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.: **FILED: JULY 19, 2022**

A.L.M. ("Mother") appeals from the decree granting the petition filed by Luzerne County Children and Youth Services ("LCCY") and terminating her parental rights to her son, H.H.M., Jr. ("Child"), born in August 2019, pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8) and (b).[1] After careful review, we affirm.

Child was placed in foster care directly from the hospital, due to concerns that Mother was not bonding with Child and because of her suicidal ideations while at the hospital. Orphans' Court Opinion at 3. LCCY had received reports that Mother had an extensive history of mental illness

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] On December 30, 2021, the orphans' court also issued a decree terminating the parental rights of Child's father, H.H.M., Sr. ("Father") pursuant to 23 Pa. C.S. § 2511(a)(2), (5), (8) and (b). Father's appeal is docketed at 180 MDA 2022.

including multiple suicide attempts, one of which occurred while Mother was pregnant with Child.  Petition for Termination of Parental Rights, 4/19/21. Mother indicated to LCCY that she had been inconsistent in receiving mental health treatment, although she had been diagnosed with schizophrenia as well as bipolar disorder, had suffered from seizures, and had issues controlling her anger. *Id*. In addition, LCCY had concerns regarding both Mother's and Father's intellectual and cognitive states: LCCY's petition for termination indicates that both Mother and Father are each intellectually and cognitively limited and have significant difficulty in retaining information regarding how to care for Child, and need to be continually reminded to feed and otherwise care for Child.  *Id*.

LCCY also reported concerns with the home where Child was going to reside.  N.T., 7/15/21 (2nd session), at 5.  At the time of Child's birth, Mother was living in an apartment, Father was living with his parents, and they were planning on the Child residing with them together at the paternal grandparents' residence, but it had been condemned and was deemed uninhabitable.  *Id*.

Child was adjudicated dependent on August 28, 2019; at that time, Mother was ordered to engage in a course of services including mental health and development, parenting education, and safe and stable housing in order to achieve unification with Child.  *Id*.   The history and status of Mother's various referrals are set forth in LCCY's petition for termination as follows:

[Mother] was referred for parenting education through Family Service Association on August 29, 2019. [She] was closed out for non-compliance on November 27, 2019. [Mother] was referred for parenting education through [Concern Professional Services] on March 4, 2020. [She] was closed out unsuccessfully on September 25, 2020. [She] was re-referred for parenting education through Family Service Association on January 26, 2021. At this time, the provider has significant concerns regarding [Mother's] intellectual capacity and her ability to meet her own basic needs in addition to meeting the needs of the minor child.

[Mother] had been receiving mental health treatment through Community Counseling Services prior to [Child's] dependency, however, [Mother] has not signed [a] release allowing [LCCY] to access her records. [Mother] was referred for mental health counseling services through the Robinson Counseling Center on March 5, 2020. [She] has not yet completed that course of treatment. At this time the provider has continued concerns regarding [Mother's] ability to meet her own needs. The provider has recommended that [Mother] engage in Mental Health and Developmental Services (MHDS). In addition, [Mother] was admitted to First Hospital for approximately a month in February and March of 2021, however, [Mother] has not signed releases for [LCCY] to obtain the records regarding this admission.

[Mother] was referred for [MHDS] through Luzerne County in December of 2020. To date, [Mother] has not engaged in or completed that service.

Petition for Termination of Parental Rights, 4/18/21.

LCCY proceeded with termination of both Mother's and Father's parental rights, and the orphans' court conducted a full-day hearing on April 15, 2021. At the time of the hearing, Child had been in placement for about 23 months. The orphans' court ordered the parties to submit written summations and on December 30, 2021, a decree was entered terminating Mother's parental rights to Child. Mother filed a timely notice of appeal and a contemporaneous

- 3 -

concise statement of errors complained of on appeal in accordance with Pa.R.A.P. 1925(a)(2)(i).

On appeal, Mother asserts generally that the orphans' court abused its discretion, committed an error of law, and/or that there was insufficient evidentiary support for its decision to terminate her parental rights. Mother's Brief at 4. More specifically, Mother asserts that the orphans' court erred in its factual findings with regard to her inability to care for Child due to limited cognitive and intellectual abilities, her incapacity to resolve the issues that led to his placement despite receiving mental health treatment and parental education, and her refusal to acknowledge the developmental delays of Child. *Id*.; *see* Orphans' Court Opinion at 6, 31, 36-37.

Our standard of review in appeals from orders terminating parental rights is deferential:

> The standard of review in termination of parental rights requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon determination of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re J.R.R.*, 229 A.3d 8, 11 (Pa. Super. 2020) (citation omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental

rights are valid.  ***See In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009).  The clear and convincing evidence standard is defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id***.  (citation and internal quotation marks omitted).

Here, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(2), (5), (8), and (b).  However, this Court may affirm the court's decision to terminate if we agree with its determination concerning any one subsection of Section 2511(a), as well as Section 2511(b).  ***See In re B.L.W***., 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).  We focus our analysis, therefore, on Section 2511(a)(8) and (b), which provide as follows:

## § 2511. Grounds for involuntary termination

(a)  **General rule.--**The rights of a parent in regard to a child may be terminated after a petition is filed on the following grounds:

-  -  -

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, and 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

-  -  -

(b) **Other considerations.--**The court in termination the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely

on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(a)(8), (b).

To satisfy Section 2511(a)(8), the petitioner must show three components: (1) that the child has been removed from the care of the parent for at least 12 months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. *In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018). Unlike other subsections, Section 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the child. *In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). "[T]he relevant inquiry" regarding the second prong of Section 2511(a)(8) "is whether the conditions that led to the removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009).

Although Section 2511(a) generally focuses on the behavior of the parent, the third prong of Section 2511(a)(8) specifically "accounts for the needs of the child." *In re C.L.G.*, 956 A.2d 999, 1008-09 (Pa. Super. 2008) (*en banc*). This Court has recognized that "the application of [Section 2511(a)(8)] may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of her children." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [18] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*Id.*

Instantly, the orphans' court determined that Child had been removed from the custody of his parents since August 20, 2019 and thus for a period well in excess of the statutorily required twelve (12) months since the date of Child's placement. The orphans' court stated:

The conditions that led to [Child's] removal from Mother and Father's care and into placement were that the natural Mother and Father did not have the capacity to resolve the issues that gave rise to the placement of [Child]. The overwhelming evidence shows that the parents' cognitive limitations and intellectual disabilities are not able to be remedied even after participating in mental health treatment and completion of the parenting education courses. Furthermore, despite the parents being told of [Child] having developmental delays, the natural parents refuse to acknowledge them.

Orphans' Court Opinion at 36-37.

The facts upon which the court relied are supported by the certified record. The orphans' court heard the testimony of Giovanni Forte, caseworker for LCCY, who stated that Child was placed with LCCY on August 20, 2019, two days after his birth, because Mother was not bonding with Child at the hospital and "there were some concerns of suicidal ideations on the part of

[M]other" as well as concerns regarding both Father's and Mother's intellectual and cognitive states and regarding where Child was going to reside. N.T., 7/15/21 (2nd session), at 4-5. Child was adjudicated dependent on August 28, 2019, and both natural parents engaged in mental health, parenting, safe and stable housing and mental health and developmental services; however, Mr. Forte testified that, to date, neither parent has successfully completed a parenting education program without any concerns by the provider. *Id*. at 6-7. He stated that he has been unable to inspect the paternal grandparents' house where Mother and Father reside since no one has answered the door there – even when he has heard voices from inside the home - despite numerous attempts to visit, and he has received no response to letters or phone calls, including phone calls made on an hourly basis over a two-week period. *Id*. at 11.

Mr. Forte stated that Child has developmental delays and there are concerns that he has autism, although it is too early for him to be diagnosed. *Id*. at 11-12. Nevertheless, Mr. Forte acknowledged that both Mother and Father had expressed to him during visits that they feel that Child is perfectly healthy and does not need any other support. *Id*. at 12. He testified further that as of the hearing date, neither Mother nor Father has admitted to or agreed with the fact that a medical professional has said that Child has developmental issues. *Id*. at 33. He believes that neither parent fully understands Child's special needs and developmental delays, and expressed safety concerns for Child if he were returned to his parents; Mr. Forte testified

that both parents' compliance and progress with services toward reunification were minimal, and terminating their parental rights would best serve Child's needs and welfare. *Id.* at 15. The caseworker confirmed that over the course of time Child has been in placement, Mother has been hospitalized with mental health issues more than once, including within the past year. *Id*. at 38. At the hearing, Mother's counsel and Father's counsel each requested that the orphans' court call upon their respective clients to confirm that neither of them would be testifying, and the court did so. *Id.* at 41-42.

Sarah Kendricks, who works at Concern Professional Services, a foster care agency that also provides community-based services such as supervised visitation, visit coaching, intensive family reunification services, and parenting and case management, testified that she provided parenting education services to Mother and Father. N.T., 7/15/21 (1st Session), at 16. She met with Mother and Father for a six-month period from April 2020 until September 2020. *Id*. Working with Ms. Kendricks, Child's parents completed a 52-chapter book of parenting lessons; however, Ms. Kendricks indicated that she did not believe they fully understood Child's disabilities and she was concerned that they would not follow through with the recommended services of providers. *Id*. at 17-19. She observed, during visits Mother and Father had with Child, that Mother did not seem to interact with Child, and Father "just sat with [Child] on his lap during the visits." *Id*. at 19. Despite the fact that Mother and Father completed the program, Ms. Kendricks could recommend

neither reunification nor unsupervised contact between parents and Child. *Id*. at 20.

Rebecca Ciliberto, a case manager in the Intensive Family Reunification Service Program at Family Service Association, testified that she served as case manager for Mother and Father on two different occasions. Beginning in August 2019, about two weeks after Child was born and following up on a referral from LCCY,[2] she assisted in establishing program goals, which included: (i) to gain a better understanding of child development, age appropriate expectations and basic parenting skills; (ii) to find and maintain safe and stable housing; (iii) for Mother to address her mental health concerns; and (iv) for Mother and Father to make appropriate decisions to increase their protective capacities and prioritize Child's needs. N.T., 7/15/21 (1st Session), at 61-62. Ms. Ciliberto stated that throughout the first period of time in which she worked with them, Mother and Father were not consistent in appearing for visits and were closed out of the program for violation of the attendance policy. *Id*. at 62-63. In January 2021, following another referral from LCCY, Ms. Ciliberto met again with the parents; this time, she established the additional goals of addressing both Mother's and Father's mental health

---

[2] Ms. Ciliberto explained that the first referral came shortly after Child's birth, when LCCY determined that parents' home had been condemned and was unsafe for Child to come home to. *Id*. at 70. Parents initially mislead her about the condition of the house, but thereafter agreed to be truthful about housing conditions going forward. *Id*. at 71.

concerns and ensuring their participation and engagement in their mental health and developmental service program. *Id.* at 64.

As of the hearing date, Ms. Ciliberto had met with parents for total of twelve sessions, a combination of phone and in-person sessions and five parent/child visitations, and Mother and Father were still engaged in the parenting program. *Id*. at 65. She reported that the only goal that they have achieved is housing, as they have been able to maintain housing with Father's parents. *Id*. She reported that they have not been consistent in attending the sessions and, in response to the orphans' court's question, she offered her opinion as to whether Mother and Father can independently parent their son:

> Not at this time. They still need a lot of prompting, a lot of guidance. So, I'm still working on them on gaining more confidence, being able to think on their own. I do tailor the parenting sessions or real life scenarios and examples. I know reading sometimes is difficult for them. So, I try to give real examples to help them [ ] to think on their own about what would happen...

*Id*. at 68.

Ms. Dawn O'Donnell, an outpatient therapist at the Robinson Counseling Center ("Robinson"), a therapeutic service provider for adult services for mental health, testified that Mother was referred by LCCY in June 2020 for individual therapy and possible medication management. N.T., 7/15/21 (1st Session), at 89. She reported that Mother had a history of anxiety and that she had previously received a diagnosis of bipolar disorder from a prior service provider. *Id*. at 90, 96. Ms. O'Donnell conducted monthly individual therapy

- 11 -

sessions with Mother from August 2020 through May 2021; however, Mother has not responded to her attempts to contact her to schedule another appointment, and because she is not reporting any symptoms of depression or anxiety to Robinson, she will be closed out of the program. *Id*. at 96.

Here, tragically, the evidence clearly establishes that Mother has been unable to make sufficient progress toward remedying the conditions that gave rise to Child's placement. Despite completion of parenting courses, Mother has not demonstrated the capacity to independently care for Child, who has special needs. Based upon these facts, we discern no abuse of discretion or error of law in the orphans' court's conclusion that the conditions leading the Child's removal continue to exist more than twelve months after his removal, and that the termination of Mother's parental rights would best serve the needs and welfare of Child.

We turn then to subsection (b), which requires the court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." *In re T.S.M*., 71 A.3d 251, 267 (Pa. 2013) (citation and quotation marks omitted). Our Supreme Court has made clear that Section 2511(b) requires the orphans' court to consider the nature and status of bond between a parent and child. *In re E.M*., 620 A.2d 481, 484-85 (Pa. 1993). It is reasonable to infer that no bond exists when there is no

evidence suggesting the existence of one. *See In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008).

Further, we have stated that "[w]hile a parent's emotional bond with his or her child is a major aspect of the [s]ubsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014). "In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *Id*. In determining needs and welfare, the court may properly consider the effect of the parent's conduct upon the child and consider "whether a parent is capable of providing for a child's safety and security or whether such needs can be better met my terminating a parent's parental rights." *In re L.W.*, 267 A.3d 517, 524 (Pa. Super. 2021). Further, our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M., supra*, at 268.

The orphans' court determined that Mother cannot meet Child's basic physical, developmental, and emotional needs, and that Child's special needs will require further attention throughout his future life. Orphans' Court Opinion at 40. The orphans' court stated that Mother "has been given ample time to address and remedy these concerns," but has been unable to do so.

*Id*.  The court noted that, in stark contrast, the foster parents "have amply demonstrated they meet the physical, developmental, emotional, and special needs" of Child and that he has thrived under their care. *Id*.  As noted by the orphans' court, Child's *guardian ad litem* ("GAL") stated in its written recommendation that terminating Mother's parental rights serves the best interest of Child.  Orphans' Court Opinion at 40.  The GAL indicated its strong feeling that a "parent-child" bond exists between Child and his foster parents and that terminating Mother's parental rights will not have any detrimental impact on Child whatsoever.  *See* Letter from GAL, 7/30/21.  The LCCY caseworker, Mr. Forte, testified that Child's foster parents are paternal cousins, that they wish to adopt Child, and that Child gets along well with their other children, who look at him as a sibling, and is well assimilated into their home.  N.T., 7/15/21 (2nd session), at 46-47.  He stated that Child is well-cared for in the foster home, and the foster parents ensure that he is taken to all necessary appointments including those for early intervention services and occupational therapy. *Id*. at 47.  Mr. Forte observed Child in the foster home at least ten times and stated that Child is well-bonded with his foster parents. *Id.* at 49.  He testified that Child "gets very upset" and "cries and screams when he's been taken from the foster mother" for a visit with his biological parents, and that having observed at least ten of these visits, he believes Child has almost no bond with them.  *Id*. at 50.

Here, the record reflects that the orphans' court appropriately considered the effect of termination of Mother's rights on Child pursuant to

Section 2511(b), and did not abuse its discretion or commit an error of law in determining that termination of Mother's rights is in Child's best interest.

As we conclude that the orphans' court did not err in terminating Mother's parental rights, we affirm the decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/19/2022